IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GALLATIN FUELS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| -vs- | ) |
| | ) Civil Action No.  02-2116 |
| | ) |
| WESTCHESTER FIRE INSURANCE COMPANY, | ) |
| | ) |
| Defendant. | ) |

AMBROSE, Chief District Judge.

# OPINION
## and
## ORDER OF COURT

The factual and procedural details of this case are well known to the parties, and I need not repeat them in detail here.  In short, Plaintiff, Gallatin Fuels, Inc. ("Plaintiff" or "Gallatin"), seeks payment under an insurance policy issued by Defendant Westchester Fire Insurance Company ("Defendant" or "Westchester") to Mon View Mining Corporation ("Mon View") for mining equipment that was destroyed or rendered unrecoverable on April 8, 2002,  when the mine in which it was being used returned to its natural water level when the power to the mine was shut off after Mon View failed to pay outstanding utility bills.  Gallatin was named as a loss payee under the policy.  Gallatin also alleges that Westchester's actions constituted bad faith in violation of Pennsylvania law.

Defendant offers the expert testimony of Arthur Sullivan ("Sullivan") to

establish the value of the mining equipment at issue.[1]  Pending is Plaintiff's Motion

in Limine (Docket No. 137) contending that Sullivan's methodology is unreliable

under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 589 (1993) and is

therefore inadmissible.  The parties have represented that a hearing is not necessary

on this issue.  Thus, I base my decision on the parties' submissions and attachments

thereto.  See Oddi v. Ford Motor Co., 234 F.3d 136, 154-55 (3d Cir. 2000).  For the

reasons set forth below, the Motion in Limine is denied.

## I.  ANALYSIS

### A. *DAUBERT* STANDARD AND RULE 702

In Daubert, the Supreme Court held that:

> [f]aced with a proffer of expert scientific testimony, ... the trial court judge must determine at the outset ... whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.  This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

Daubert v. Merrell Dow Pharm., Inc. 509 U.S. 579, 592-93 (1993).  More recently, in

Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999), the Supreme Court

clarified any confusion regarding the intended reach of the Daubert decision, by

---

[1]  Sullivan is a Vice President of Norwest Corporation, a privately-owned consulting group servicing the resource industry.  According to his resume, Sullivan has almost forty years experience in the coal industry, including experience in executive management, operations management, engineering, safety and loss control, coal marketing and both domestic and international consulting projects.  Sullivan testified at his deposition that he has performed at least three large valuations of mining equipment in the past.  Sullivan has Bachelor of Science degrees in Mining Engineering and Civil Engineering.  He also has a Juris Doctor degree and is a licensed Pennsylvania attorney.

declaring that the trial judge must perform this "basic gatekeeping obligation" with respect to all expert matters, not just "scientific" matters.  In the Third Circuit,  the trial court's role as a "gatekeeper" requires proof that: (1) the proffered witness is qualified as an expert; (2) the expert must testify about matters requiring scientific, technical, or specialized knowledge; and (3) the expert's testimony must "fit" the facts of the case.  In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741-42 (3d Cir. 1994). Thus, pursuant to Daubert, the gatekeeping function requires the court to ensure that the expert testimony is both reliable and relevant.  Daubert, 509 U.S. at 589; Kumho Tire Co., 526 U.S. at 147.

As to the first requirement - qualification - the Court of Appeals for the Third Circuit has "eschewed imposing overly rigorous requirements of expertise and [has] been satisfied with more general qualifications."  Paoli, 35 F.3d at 741.  "Rule 702's liberal policy of admissibility extends to the substantive as well as the formal qualification of experts."  Id.  Thus, an expert can qualify based on a broad range of knowledge, skills, training and experience.

The second inquiry focuses on methodology.  The inquiry into methodology is designed to ensure that an expert's opinions are based upon "'methods and procedures of science' rather than on subjective belief or unsupported speculation." Id. at 742.  Factors used to assess reliability include whether: (1) the theory or technique can be tested; (2) the theory or technique has been peer reviewed; (3) there is a high rate of known or potential error; (4) there are standards of control; (5) the theory is "generally accepted"; (6) there is a sufficient relationship between

the technique and methods which have been established to be reliable; (7) the expert's qualifications are sufficient; and (8) the method has been put to non-judicial uses.  See Magistrini v. One Hour Martinizing Dry Cleaning, 180 F. Supp. 2d 584, 594 (D.N.J. 2002), aff'd, 68 F. App'x 356 (3d Cir. 2003).  "Some courts also consider additional factors relevant in determining reliability, including: (i) whether the expert's proposed testimony grows naturally and directly out of research the expert has conducted independent of the litigation . . . ; (ii) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion. . . ; (iii) whether the expert has adequately accounted for alternative explanations . . . ; (iv) whether the expert is being as careful as he would be in his professional work outside of the litigation context . . . ; and (v) whether the field of expertise asserted by the expert is known to reach reliable results for the type of opinion proffered by the expert . . . ." Id. at 594-95 (citations omitted).

Although this list of factors is lengthy, not each factor will be relevant to every reliability analysis.  The "test of reliability is 'flexible.'" Kumho, 526 U.S. at 141. According to the Supreme Court,   "Daubert's list of specific factors neither necessarily nor exclusively applies to all experts." Id.  The relevance of the Daubert factors depends "on the nature of the issue, the expert's particular expertise, and the subject of his testimony." Id. at 150 (internal quotation marks and citations omitted).

Finally, Daubert and Rule 702 require that the expert's testimony "fit" the facts of the case.  "'Fit' requires that the proffered testimony must in fact assist the jury,

4

by providing it with relevant information, necessary to a reasoned decision of the case." Magistrini, 180 F. Supp. 2d at 595 (citing Paoli, 35 F.3d at 743).

## B. SULLIVAN'S OPINION ON VALUATION OF EQUIPMENT

### 1. Relevance

As an initial matter, I note that the Court already has ruled as a matter of law that the coverage available to Gallatin is $1,925,000, and, therefore, that Gallatin's maximum allowable recovery under the policy cannot exceed that amount. Because Sullivan valued the equipment at issue at a higher amount ($2,300,000), it is questionable whether his opinion is even relevant. Plaintiff argues, however, that valuation evidence may be relevant to Defendant's argument that Gallatin misrepresented the equipment's value on its proof of loss. Plaintiff also indicated that a finding as to the value of the equipment would be helpful in the event Plaintiff argues successfully on appeal that a higher policy limit should apply. Accordingly, I will address the substance of Plaintiff's Motion.

### 2. Sullivan's Methodology

The insurance policy at issue in this case contains two provisions addressing the valuation of covered property. The first valuation clause, contained in the Declarations section of the Policy, provides that:

The basis of payment for loss or damage shall be:

A. Buildings and contents, at replacement cost but not to exceed the limit of liability per the schedule on the application on file with the Company;

B. All other property at Actual Cash Value.

(Policy, Declarations, page 8 of 23).   In addition, the Commercial Inland Marine Conditions set forth:

>     The value of property will be the least of the following amounts:
>
>     1.  The actual cash value of the property,
>
>     2.  The cost of reasonably restoring the property to its condition immediately before loss or damage; or
>
>     3.  The cost of replacing that property with substantially identical property.
>
>     In the event of loss or damage, the value of the property will be determined as of the time of loss or damage.

(Policy, Commercial Inland Conditions, page 3 of 3).   The Policy does not define "actual cash value."   Plaintiff contends that the mining equipment at issue in this case was totally destroyed on or about April 8, 2002.   In his Report, Sullivan renders an opinion on the actual cash value of that equipment at the time of loss as well as the cost of replacing that property with substantially identical property.[2]   The methodology Sullivan used to reach his "actual cash value" determination is the subject of Plaintiff's Motion.

        To determine the "actual cash value" of the equipment at issue in this case, Sullivan began by determining the "historic cash purchase price" (i.e., actual cash cost) of a new machine identical or very similar to each subject machine immediately prior to the loss (i.e., immediately prior to April 8, 2002). He then made various deductions to adjust for the diminution in value of the machine.  Sullivan

_____

[2] Sullivan did not render an opinion as to the cost of reasonably restoring the property to its condition immediately before the loss or damage because he viewed that option as inapplicable to a total loss situation.  Sullivan Report at 2-1.

Report, section 2.[3]  Sullivan next applied the deductions to the historic cash purchase price to establish the "actual cash value" of each item.  Id.  Applying this "actual cash value" approach, Sullivan concluded that the total value of the subject equipment on or about April 7, 2002 (immediately prior to the loss) was $2,300,000.  Id. at 4-8. Sullivan agreed at his deposition that this dollar amount could be fairly summarized as the replacement cost for the equipment as of April 8, 2002 less all wear and tear factors based on his knowledge of the industry.  Sullivan Dep. at 130-32, 161.  He further testified that he applied this valuation method based on his understanding of the Policy and Pennsylvania law as represented to him by Defendant's counsel. Sullivan Dep. at 14-15.

Plaintiff argues that Sullivan's opinion must be excluded because his methodology has no basis in Pennsylvania law.  Motion in Limine at 2.  Specifically, Plaintiff contends that, under Pennsylvania law, actual cash value means what it would cost to replace the property at issue as of the date of loss, without deduction for depreciation.  Plaintiff contends that to the extent Sullivan relied on counsel for Westchester's representations as to what constitutes actual cash value under Pennsylvania law, Westchester's understanding of actual cash value as including a deduction for depreciation is wrong.  I disagree.

It is well-established that, under Pennsylvania law, actual cash value in a policy

---

[3]  The eight factors Sullivan used to establish valuation deductions were: (1) age since the machine was new; (2) general condition; (3) deterioration of wear parts; (4) deterioration and damage to main structural members; (5) non-performance of generally accepted routine repair; (6) failure to perform commonly accepted major component replacement; (7) tonnage produced since the machine was new or a major rebuild; and (8) lack of routine preventative maintenance.  Sullivan Report at 2-2.

of insurance means what it would cost to replace a building or chattel as of the date of the loss.  Fedas v. Ins. Co. of State of Pa., 151 A. 285, 288 (Pa. 1930).  That is, "'actual cash value' means the actual value expressed in terms of money of the thing for the purpose for which it was used; in other words, the real value to replace."  Id.  The question is whether or not depreciation enters into this calculation.

Plaintiff is correct that courts applying Pennsylvania law consistently have held that, unless otherwise stated in the insurance policy, "where an insured suffers a partial loss and is promised 'actual cash value,' he is entitled to replacement cost [up to the policy limit], without deduction for depreciation."  Kane v. State Farm Fire & Cas. Co., 841 A.2d 1038, 1046 (Pa. Super. Ct. 2003) (emphasis added) (citing Fedas, 151 A. at 288 and Farber v. Perkiomen Mut. Ins. Co., 88 A.2d 776, 779 (Pa. 1952)); see also Albert v. Nationwide Mut. Fire Ins. Co., No. Civ. A. 3CV991953, 2001 WL 34035315, at * 5 (M.D. Pa. May 22, 2001); Sylvania Gardens Apartments RJS Sherwood Assocs. v. Hartford Fire Ins. Co., No. Civ. A. 98-5870, 2000 WL 764919, at *3 (E.D. Pa. June 8, 2000), aff'd, 276 F.3d 580 (3d Cir. 2001).  I agree with Defendant, however, that this conclusion does not follow where, as here, the property is a total loss.[4]  Rather, a careful examination of Pennsylvania case law on this subject indicates that depreciation is a component of "actual cash value" in a total loss situation.

---

[4]  I do agree with Plaintiff that the portions of the cases Defendant cites in support of its position that depreciation is a factor, Canulli v. Allstate Ins. Co., 462 A.2d 286 (Pa. Super. Ct. 1983), Gilderman v. State Farm Ins. Co., 649 A.2d 941 (Pa. Super. Ct. 1994), and TJS Brokerage & Co. v. Hartford Cas. Ins. Co., No. 2755 Dec. Term 1995, 2000 WL 1060645 (Pa. Ct. C.P. Apr. 24, 2000), aff'd, 778 A.2d 745 (Pa. Super. Ct. 2001), are dicta and/or otherwise non-binding.  For the reasons set forth in this Opinion, however, I agree with Defendant's position that actual cash value in a total loss situation equals replacement cost less depreciation.

For example, in <u>Farber</u>, which involved partial fire damage to a building, the parties stipulated that the "actual cash value" of the entire building included a 60% depreciation deduction.  88 A. at 777.  The Pennsylvania Supreme Court did not disagree with this method of valuation.  Rather, the Court simply held that the insurer could not depreciate the reproduction cost of the labor and materials necessary to restore the building to its pre-fire condition.  <u>Id.</u> at 778 ("The sole question in this case is whether the loss as determined by the reproduction cost new of the restoration should be depreciated <u>by the percentage of depreciation applicable to the building as a whole</u> in determining its actual cash value immediately prior to the fire.  Under the decisions of this court, that question must be answered in the negative." (emphasis added)); <u>see also</u> <u>Patriotic Order Sons of Am. Hall Ass'n v. Hartford Fire Ins. Co.</u>, 157 A. 259, 260 (Pa. 1931) ("'Actual cash value' means what the thing is worth in money, allowing for depreciation.  Sound value is the same thing, what the property was worth, allowing for depreciation, in its undamaged state."); <u>London v. Ins. Placement Facility of Pa.</u>, 703 A.2d 45, 50 (Pa. Super. Ct. 1997) ("The <u>Farber</u> decision arguably prevents insurance companies from deducting depreciation in the event of a partial loss that does not exceed the depreciated value of the whole property."); <u>Kane</u>, 841 A.2d at 1047 (same); <u>Peltz v. Nationwide Mut. Fire Co.</u>, No. 127 Jan. Term 2001, 2001 WL 1808037 (Pa. Ct. C.P. Aug. 13, 2001) (distinguishing total and partial losses).

Plaintiff concedes that the Pennsylvania Supreme Court has taken depreciation into account, even in a partial loss situation, where the property

involved was real estate.  See Gallatin Fuels' Sur-reply Brief in Opposition to Westchester Fire's Motions for Summary Judgment at 7.[5] Plaintiff argues, however, that this rationale does not apply in cases involving personal as opposed to real property.  Plaintiff has not pointed to any case law, and independent research has revealed none, supporting such a distinction.  If anything, the very quote from the case Plaintiff cites in support of this proposition, Fedas, suggests that depreciation is a factor when personal property is destroyed.  Specifically, the Fedas Court stated:

> Furniture in use in a home destroyed must be valued at what it was worth in cash, considering the use to which it had been put.  What its value might have been to another as secondhand furniture furnishes no aid; but age with use may enter into the calculation.

151 A. at 288 (emphasis added).[6]

The rationale behind disallowing depreciation deductions in a partial loss situation is that deducting depreciation from the cost of new materials would frequently result in a sum insufficient to complete the repairs necessary to return partially damaged property to its undamaged state.  This concern simply does not apply in a total loss situation.  See Peltz, 2001 WL 1808037, at **12-13 (citing numerous authorities); London, 703 A.2d at 55-61 (Ford Elliott, J., concurring and dissenting).[7]  Rather, in a total loss situation, to allow recovery without a

---

[5] Plaintiff incorporates this brief by reference in its Motion in Limine.  (Docket No. 137, Ex. D).

[6] Curiously, Plaintiff neglected to include the underlined portion of this Fedas quote in its Brief. (Docket No. 137, Ex. D, at 7).  It is precisely this portion of the quotation that suggests depreciation would be a factor in determining the actual cash value of destroyed chattels.

[7] The majority in London did not reach this point.  Although not binding, I find Judge Ford-Elliott's analysis to be accurate and in accordance with other Pennsylvania case law on this issue.

depreciation deduction would result in a windfall to the insured.  See id.

Another factor supporting the conclusion that "actual cash value" includes depreciation under the facts of this case is the language of the Policy itself. Although the term is not specifically defined, the language of the Policy strongly suggests that the parties did not intend "actual cash value" to mean replacement cost without a deduction for depreciation.  As set forth above, the Policy allows insureds to recover the lesser of the actual cash value of the property; the cost to restore the property to its pre-damage condition; or the cost to replace the property.  The valuation language contained in the Policy's Declarations section likewise limits recovery to actual cash value or replacement cost, depending on the type of property at issue.  To interpret "actual cash value" in these sections to mean replacement cost without deduction for depreciation would render the policy language referring to replacement cost redundant and nonsensical.  See Kane, 841 A.2d at 1050.

In short, I find that the phrase "actual cash value" in a total loss situation means replacement cost less depreciation within the meaning of Pennsylvania law and the Policy language at issue.  Because this is precisely the methodology Sullivan used to determine "actual cash value" of the destroyed mining equipment at issue, Plaintiff's motion to exclude Sullivan's testimony on this basis is denied.

Plaintiff also argues that I should exclude Sullivan's testimony because, even if his methodology is accurate, this is the first time he has ever applied that methodology.  I disagree.  Gallatin does not dispute that Sullivan has extensive

experience in the mining industry, including experience valuing mining equipment. Sullivan's deposition testimony and resume also demonstrate that he has personal professional experience regarding wear, tear and other factors relating to the depreciation of mining equipment in the coal mining industry.   Although Sullivan admits that he has not applied this particular methodology in the past (because he was never called upon to do so), his deposition testimony demonstrates that he understood the methodology when explained and applied it properly based on his experience in the industry.

Finally, Plaintiff makes much of the fact that Sullivan's colleagues "questioned" his methodology when they reviewed his draft report.  As Sullivan explained in his deposition, however, his colleagues simply were unfamiliar with the methodology because their experience primarily lies in other jurisdictions, and that after Sullivan explained the methodology to them, they understood.  Sullivan Dep. at 14-15.[8]

## II.  CONCLUSION

For all of the reasons set forth above, Plaintiff's Motion in Limine to Exclude the Opinion of Art Sullivan on Valuation of Equipment as Substantive Evidence is denied.

* * * * * * * * * * * * * * * * * * * * * * * * * *

---

[8]  My ruling today pertains solely to the admissibility of Sullivan's proposed testimony, not its weight.  Thus, Plaintiff is free to attack this and any other perceived weaknesses of Sullivan's opinion at trial.  Likewise, nothing in this Opinion shall preclude Plaintiff from making other applicable objections, if any, to Sullivan's testimony at trial.

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GALLATIN FUELS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| -vs- | ) |
| | )   Civil Action No.  02-2116 |
| | ) |
| WESTCHESTER FIRE INSURANCE COMPANY, | ) |
| | ) |
| Defendant. | ) |

AMBROSE, Chief District Judge.

_____ **ORDER OF COURT**

AND NOW, this **13ᵗʰ** day of January, 2006, after careful consideration and for the reasons set forth in the accompanying Opinion, Plaintiff's Motion in Limine to Exclude the Opinion of Art Sullivan on Valuation of Equipment of Substantive Evidence (Docket No. 137) is DENIED.

BY THE COURT:

S/ Donetta W. Ambrose

Donetta W. Ambrose,
Chief U. S. District Judge

13