IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GALLATIN FUELS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| -vs- | ) |
| | ) Civil Action No. 02-2116 |
| | ) |
| WESTCHESTER FIRE INSURANCE COMPANY, | ) |
| | ) |
| Defendant. | ) |

AMBROSE, Chief District Judge.

# OPINION
## and
## ORDER OF COURT

The factual and procedural details of this case are well known to the parties, and I need not repeat them in detail here.  In short, Plaintiff, Gallatin Fuels, Inc. ("Plaintiff" or "Gallatin"), filed this suit seeking payment under an insurance policy issued by Defendant Westchester Fire Insurance Company ("Defendant" or "Westchester") to Mon View Mining Corporation ("Mon View") for mining equipment that was destroyed or rendered unrecoverable on April 8, 2002,  when the mine in which it was being used returned to its natural water level after the power to the mine was shut off after Mon View failed to pay outstanding utility bills.  Gallatin was named as a loss payee under the policy.  Gallatin also alleged that Westchester's actions constituted bad faith in violation of Pennsylvania law.

A jury trial began in this case on February 6, 2006,  and concluded on February 21, 2006.  At the conclusion of the trial, the jury returned a verdict in favor of

Gallatin on both counts.  The jury awarded Gallatin a net total of $1.325 million on its claim for payment under the insurance policy and awarded Gallatin $20 million in punitive damages on the bad faith claim.[1]  On March 2, 2006, I granted Defendant's Motion to delay entry of judgment in light of Defendant's expressed intent to challenge the constitutionality of the jury's punitive damages award.

Pending is Defendant's Pre-Judgment Motion for Review of the Jury's Punitive Damages Award, Including a Due Process Hearing, and Specification of the Jury's Factual Findings on Which the Court's Legal Finding on Fortuitous Loss Is Based. (Docket No. 217).   As set forth more fully below, the Motion is granted in part and denied in part.

## I. ANALYSIS

### A. PUNITIVE DAMAGES

#### 1. Request for Hearing and Additional Briefing

In its Motion, Defendant requests a due process hearing and review of the jury's punitive damages award under governing constitutional standards, prior to the entry of judgment.  Defendant also seeks permission to file additional briefs on this issue after it receives a copy of the trial transcript (which Defendant advises will not be completed for at least thirty days).  As an initial matter, although I agree that review of the punitive damages award is warranted, I disagree that Defendant is entitled to a due process hearing and/or the opportunity for additional briefing on

---

[1]  The jury awarded Plaintiff $1.925 million (the maximum available under the policy) on its contract claim, but found that Plaintiff's damages should be reduced by $600,000 because Plaintiff did not adequately mitigate its damages.  In accordance with this finding, I have deducted $600,000 from the $1.925 million Plaintiff was entitled to recover under the policy, for a net result of $1.325 million.

this issue.

Although it is appropriate for the trial court to conduct a meaningful and adequate post-verdict review of a jury's punitive damages award to ensure that it comports with due process, Defendant has not cited, nor has independent research revealed, any authority suggesting that the court is required to conduct a due process hearing in connection with its punitive damages review.[2] In this case, I find that a hearing is unnecessary and would serve only to further delay resolution of this matter.

Defendant's request for additional briefing on the punitive damages issue is likewise denied.  On March 2, 2006, I granted Defendant's Motion to Delay Entry of Judgment.  (Docket No. 213).  In my Order granting that Motion, I specifically stated that Defendant would have until March 9, 2006 "to file any motions and briefs prior to the entry of judgment."  Id. (emphasis added).  In addition to my written Order, I orally conveyed this information to Defendant during a telephone conference on that same date.  See Docket No. 212.  Moreover, on March 22, 2006, I leniently granted Defendant leave to file a Reply Brief belatedly addressing, inter alia, the appropriate constitutional analysis of the punitive damages award.[3] The trial in this case ended and the jury returned its verdict on February 21, 2006 – over four weeks ago. Defendant's request to delay the entry of judgment for at least another thirty days

---

[2] Defendant likewise has failed to credibly explain how a transcript is necessary for this post-trial inquiry.

[3] Although I have considered Defendant's Reply Brief, nothing in that Reply Brief materially affected my resolution of the instant Motion.  That is, my decision to reduce the punitive damages award would have been the same even if Defendant had not filed its Reply Brief.

to file even more briefs is untenable, directly contravenes my March 2, 2006 Order, and is denied.

Defendant's Motion is granted, however, to the extent it requests that I review the constitutionality of Plaintiff's punitive damages award.[4] For the reasons set forth below, I find that the $20 million punitive damages award was unconstitutionally excessive and that an award of $4.5 million would be more appropriate based on the evidence in this case.

## 2. Applicable Legal Standards

In contrast to compensatory damages, which "are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct," punitive damages are intended "to punish the defendant and to deter further wrongdoing." Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 432 (2001). It is well-established that there are procedural and substantive constitutional limitations on punitive damages awards. State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 416 (2003). In particular, due process demands that a defendant "receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." Id. at 417 (quoting BMW of N. Am. v. Gore, 517 U.S. 559, 574 (1996)); Willow Inn, Inc. v. Pub. Serv. Mut. Ins. Co., 399 F.3d 224, 230 (3d Cir. 2005). "To the extent an award is grossly

---

[4] In its Brief in Opposition, Plaintiff requests that I deem Defendant's challenge to the punitive damage award to be waived based on Defendant's failure to brief the issue in accordance with my prior Order. I agree with Plaintiff that there is no excuse for Defendant's dilatory handling of this issue. However, given that Defendant at least raised the due process question in its initial Motion, coupled with my own concerns regarding the constitutionality of the punitive damage award, I decline to find a waiver at this time. Again, my decision not to find a waiver would have been the same even if Defendant had not filed a Reply Brief.

excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property." State Farm, 538 U.S. at 417.

To address these concerns, the United States Supreme Court has "instructed courts reviewing punitive damages awards to consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." Id. at 418 (quoting Gore, 517 U.S. at 575).

In jury trials such as this, "concerns of judicial overreaching dictate that trial judges view jury determinations of appropriate punitive damages with a measure of deference." Willow Inn, 399 F.3d at 231. Thus, "[i]f a jury's punitive damages award is free of irrationality, passion, and prejudice, and falls within the 'broad discretion in authorizing and limiting permissible punitive damages awards' lodged with the state legislatures, a trial judge should not substitute his or her view of the appropriate amount of punitive damages for the jury's determination." Id. (citations omitted) (quoting Cooper Indus., 532 U.S. at 433). If a court determines that a jury's punitive damages award is unconstitutionally excessive, the court should decrease the award to an amount the evidence will bear. Id. (citing Dunn v. Hovic, 1 F.3d 1371, 1381 (3d Cir. 1993)).

With these considerations in mind, I next address each of the Supreme Court's three guideposts in turn.

3.  **Gore/State Farm Review**

    a.  **Degree of Reprehensibility**

The "most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." State Farm, 538 U.S. at 419; Gore, 517 U.S. at 575; Willow Inn, 399 F.3d at 230.  The Supreme Court has instructed courts to determine the reprehensibility of a defendant by considering five subfactors:  whether "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." State Farm, 538 U.S. at 419.  "The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." Id.

Applying these subfactors to the instant case, it is evident that some reduction of the jury's punitive damages award is required.  First, the harm caused by Defendant was economic, not physical.  Second, Defendant's conduct did not directly concern the health or safety of others.  Thus, these two subfactors weigh against an exorbitant punitive damages award.

The third, fourth, and fifth reprehensibility subfactors, however, lean in favor of Plaintiff.  First, although Plaintiff may not have been as financially vulnerable as many individual insurance claimants, the evidence indicates that Plaintiff was under

some financial strain as a result of Mon View's financial difficulties, especially in comparison to Defendant.[5]  There was also evidence that Defendant was aware of this financial strain.  Despite Plaintiff's financial vulnerability, Defendant intentionally deprived Plaintiff of funds to which it was entitled under the policy.

Second, Defendant's conduct involved repeated actions.  Specifically, similar to (and even more egregious than) the case in <u>Willow Inn</u>, Defendant engaged in a series of actions and inactions that delayed payment of Plaintiff's claim until present – a period of more than four years.  Although this type of "repeated conduct" (a pattern of contemptible conduct within one extended transaction) does not carry as much force as evidence of specific instances of similar conduct by a defendant in relation to other parties, it is relevant insofar as the pattern of delay implies a concerted effort to lessen Plaintiff's expected payment on the claim and suggests that Defendant's actions "were designed to achieve a fiscally beneficial result for itself at odds with the Pennsylvania Supreme Court's long-time dictate that an insurer must act with the 'utmost good faith' toward its insured."  <u>Willow Inn</u>, 399 F.3d at 232-33.  In this regard, the court in <u>Willow Inn</u> (a Pennsylvania insurance bad-faith case involving a delayed claim payment) noted that valid claimants who were less diligent than the plaintiff in that case, when confronted with similar behavior by the insurer, would have abandoned their claims in frustration.  <u>Id.</u> at 233.  The court further stated that the dilatory tactics of the insurer effectively produced an interest-free loan to the insurer from the plaintiff of the value of the claim for as

---

[5]  The evidence at trial indicated that Defendant's assets exceed $1.9 billion.

long as the insurer was able to prolong payment.  Id.  I find that these concerns apply equally, if not more so, to Defendant's dilatory behavior in this case.  See also CGB Occupational Therapy, Inc. v. RHA Pa. Nursing Homes, No. Civ. A. 00-4918, 2005 WL 1595428, at *4 (E.D. Pa. July 5, 2005) (citing evidence of repeated stalling and dishonesty extending to the eve of trial).

Third, and finally, there was an abundance of evidence presented at trial indicating that Defendant's conduct was intentionally dilatory and was not the result of "mere accident."[6]  Among many other things, there was evidence at trial that Defendant refused Plaintiff's request for assistance in completing the Proof of Loss form and that the outside adjuster never explained that documentation of the value of the equipment was required to make the claim form complete.  Yet, Defendant proceeded to reject the proof of loss form as incomplete.  There was also evidence that Defendant made no effort to comply in a number of ways with Pennsylvania regulations regarding claims handling practices and intentionally stonewalled Plaintiff's efforts to recover under the policy.  These are but a few examples from the totality of the evidence which, in Plaintiff's words, demonstrates that Defendant "repeatedly put its own interest higher than its insured, carefully selectively crediting evidence that favored itself, wholly fabricating evidence where necessary, to bully, harass, intimidate, threaten and coerce Gallatin Fuels into

---

[6] Indeed, in order to find for Plaintiff on the bad-faith claim, the jury was required to conclude not only that Defendant lacked a reasonable basis for denying Plaintiff benefits under the policy, but also that Defendant knew or recklessly disregarded its lack of reasonable basis in denying the claim.  The evidence more than supports the jury's finding in this regard, which itself indicates that Defendant's behavior was not a "mere accident."

8

dropping its claim." Pl.'s Br. in Opp. at 6-7.

Considering the five subfactors as a whole, I find that Defendant's conduct was clearly reprehensible and I in no way suggest that the jury erred in awarding punitive damages to Plaintiff based on Defendant's egregious and outrageous conduct. The totality of the factors, however, indicates that the exorbitant punitive damages award here is out of proportion to the reprehensibility of Defendant's conduct and that a more modest (although still significant) punishment for that conduct, in the amount of $4.5 million, would have satisfied the State's legitimate objectives. See State Farm, 538 U.S. at 419-20.

### b. **Ratio of Punitive Damages to Harm**

"The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." Gore, 517 U.S. at 580; Willow Inn, 399 F.3d at 233. "The constitutionally acceptable range is not reducible to a simple mathematical formula, and the Supreme Court has been reluctant to identify concrete constitutional limits on the ratio." Willow Inn, 399 F.3d at 233 (internal quotations and citations omitted). "Rather, the ratio of punitive damages to the harm caused by the defendant is a tool to ensure that the two bear a reasonable relationship to each other." Id. at 233-34. Although the Supreme Court clearly has eschewed a bright-line ratio, it has noted that, " in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." State Farm, 538 U.S. at 425.

9

The Court of Appeals for the Third Circuit recently considered the issue of what figure should comprise the second term of the ratio in an insurance bad-faith case; that is, the amount to which the punitive damages award should be compared. Willow Inn, 399 F.3d at 234-37.  In Willow Inn, the insurer payed Willow Inn's claim prior to the lawsuit.  Willow Inn nevertheless sued the insurer under the Pennsylvania bad faith statute on the grounds that the insurer unreasonably delayed settling the claim.  After a bench trial, the trial court found in favor of Willow Inn and awarded it $2,000 on an incidental contract claim, plus $150,000 in punitive damages and attorneys' fees and costs, later set at $128,075 and $7,372, respectively, on the bad faith claim.  Id. at 227.  On appeal of the constitutionality of the punitive damages award, the parties disagreed, among other things, as to the second component of the ratio analysis.

In deciding this issue, the court of appeals first held that the district court had erred by using the amount of Willow Inn's claim under the policy, $125,000, as the comparator in the ratio analysis.  Id. at 234.  Because the insurer had paid the claim prior to the lawsuit, this amount did not represent Willow Inn's actual harm, and the appeals court rejected the district court's application of a "potential harm" analysis to the facts.  Id.  The appeals court, however, also rejected the insurer's argument that Willow Inn's $2,000 award on its contract claim should control.  The court explained that the $2,000 award related to only one small aspect of the insurer's bad faith conduct (its unreasonable refusal to pay on a policy provision defraying Willow Inn's costs of preparing a Proof of Loss), and was in no way indicative of the sum of

the insurer's culpability.  Id. at 234-35.  The court noted that the bad faith statute permitted Willow Inn to pursue a bad faith claim for unreasonable delay even though its claim ultimately was settled and paid and that the bad faith award was not tied to or dependent on the incidental contract claim.  Id.

Finally, the court considered Willow Inn's contention that the term for ratio purposes should include the amount of the claim, attorneys' fees and costs, and the potential profits the insurer would reap from deploying similar stonewalling tactics as its normal operating procedure.  Id. at 235.  The court rejected Willow Inn's "potential profits" argument because Willow Inn did not prove at trial that the insurer's conduct was typical of its claims handling practices and that the $150,000 punitive damages award in that case already was approaching the constitutional limits. Id.  The court also declined to look at the amount of the main insurance claim because that claim had been settled prior to the lawsuit or the $2,000 contract award because it was only incidental to the bad faith action.  The court, however, did find that the attorney's fees and costs awarded as part of the § 8371 claim were the proper terms to compare to the punitive damages award for ratio purposes. Id.  In support of its decision to include awards of attorney fees and costs in the ratio analysis, the court cited to the en banc decision of the Pennsylvania Superior Court in Hollock v. Erie Ins. Exch., 842 A.2d 409, 421 (2004), appeal granted in part, 842 A.2d 409 (Pa. 2005), which considered § 8371's attorney fees, costs, and interest awards to be compensatory damages for Gore/State Farm multiplier purposes. Willow Inn, 399 F.3d at 236.  The court also cited its prior decision in Klinger v. State

11

Farm Mut. Auto. Ins. Co., 115 F.3d 230, 236 (3d Cir. 1997), which explained that attorneys' fees under § 8371 are additional damages awarded to compensate the plaintiff for having to pay an attorney to get that to which it was contractually entitled. Willow Inn, 399 F.3d at 237.

As in Willow Inn, the parties in this case disagree as to the components of the second ratio factor. Plaintiff contends that I should consider the amount awarded on its contract claim as well as any attorneys' fees and interest that I may award on its bad faith claim. Defendant counters that because, unlike Willow Inn, this case included a claim and award for payment under the policy, only that contract award is pertinent. Based on the court of appeals' decision in Willow Inn, as well as the Pennsylvania Superior Court's decision in Hollock, I tend to agree with Plaintiff that the appropriate factors include attorneys' fees and interest as well as the contract award under the policy.[7] The Court in Willow Inn nowhere states that attorneys' fees and costs are only relevant if contract damages are not at issue. To the contrary, the language of the opinion suggests that the amount of the claim also would have been included if, as here, the claim had not been settled prior to the lawsuit and was central to the thrust of the bad faith allegations. See id. at 235-37.

I need not decide this issue, however, because I find that the $20 million punitive damages verdict is unconstitutionally excessive regardless of whether or

---

[7] Plaintiff further argues that, in addition to the contract award, attorneys' fees, and interest, I should include in the calculation the full alleged value of the lost equipment ($3,125,000) as well as amounts resulting from (1) Defendant's alleged attack on the reputation and character of Plaintiff's officers and owners and (2) alleged lost business and investment opportunities resulting from the improper deprivation of insurance benefits. Pl.'s Br. in Opp. at 11. I disagree. Rather, I find that these additional items were either unproven and/or are irrelevant to the ratio analysis.

not attorneys' fees and interest are taken into account in the ratio analysis.  The jury in this case awarded Plaintiff a net total of $1.325 million dollars on its claim for payment under the policy.  Comparing that figure alone to the $20 million punitive damages award results in a roughly 15:1 ratio, well above the single-digit range that the Supreme Court cited as typically appropriate, and clearly disproportionate under the facts and circumstances in this case.  Even if I add the amount of actual attorneys' fees and interest Plaintiff claims as bad faith damages – $953,397.90 and $396,447.32, respectively – to the contract claim award (for a total of $2,674,845.22), the result is approximately a 7.5:1 ratio, on the high end of the single-digit range, and still constitutionally excessive compared to the reprehensibility of the Defendant's conduct in this case as described above.  See Willow Inn, 399 F.3d at 235 (ratio of only 1:1 approached constitutional limit given the reprehensibility of the insurer's conduct in the case); see also State Farm, 538 U.S. at 424-25 (citing past cases in which the Supreme Court considered a 4:1 ratio to be "close to the line of constitutional impropriety").

As set forth in Section I.A.3.a, supra, I find that a punitive damages award of $4,500,000 is the maximum amount supportable given the evidence of Defendant's reprehensibility in this case. Using only the contract award as comparison, this award results in an approximate 3.4:1 ratio, on the low-end of the single-digit range, and indicative of constitutionality under Gore and State Farm.  Factoring in the claimed interest and attorneys' fees only decreases the ratio and thus does not alter the constitutionality analysis.  Both of these ratios are close to the ratio upheld as

constitutional in <u>Willow Inn</u>.  Although Defendant's conduct in this case appears to have been slightly more reprehensible than the conduct of the insurer in <u>Willow Inn</u> (based on, e.g, Defendant's  total failure to pay  the claim and the length of time involved), the difference is not great enough to justify a more significant departure from the <u>Willow Inn</u> guidelines.  Likewise, this is not a case involving a hard-to-quantify injury or a particularly egregious act that has resulted in only a small amount of economic damages that would justify a greater-than-usual ratio.

### c. <u>Civil Penalties</u>

The third and final guidepost I must examine is the disparity between the punitive damages award and the civil penalties authorized or imposed in similar cases.  <u>State Farm</u>, 538 U.S. at 428; <u>Willow Inn</u>, 399 F.3d at 237.  A "civil penalty" is "a 'fine assessed for a violation of a statute or regulation,' and as such [is] paid to the government, not to the opposing party or their counsel." <u>Willow Inn</u>, 399 F.3d at 237 (quoting Black's Law Dictionary 1168 (8th ed. 2004)).  The Supreme Court also "has suggested that a loss of one's business license might count as a civil penalty for purposes of due process review of punitive damages awards." <u>Id.</u> (citing <u>State Farm</u>, 538 U.S. at 428).

Here, the most applicable civil penalty is contained in Pennsylvania's Unfair Insurance Practices Act ("UIPA"), 40 Pa. Stat. § 1171.1, <u>et seq.</u>, which forbids insurance companies, under certain circumstances, from, <u>inter alia</u>, refusing to pay claims without conducting a reasonable investigation; not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which the company's

liability under the policy has become reasonably clear; and compelling persons to institute litigation to recover amounts due under an insurance policy.  See 40 Pa. Stat. § 1171.5; see also Willow Inn, 399 F.3d at 237; Hrobuchak v. Nationwide Prop. & Cas. Ins. Co., No. 3:03 CV 0591, 2004 WL 3333124, at *7 (M.D. Pa. Sept. 24, 2004).  The statute includes a penalty of up to $5,000 for each known violation and escalating civil penalties for repeat violations, up to and including the suspension and revocation of one's license to issue insurance policies.  See 40 Pa. Stat. §§ 1171.9, .11.

The court of appeals in Willow Inn explained that "the Supreme Court has not declared how courts are to measure civil penalties against punitive damages, and many courts have noted the difficulty in doing so."  Willow Inn, 399 F.3d at 238.  The court noted that it was "similarly unsure as to how to properly apply this guidepost" and refused to overturn the punitive damages award consisting of a 1:1 ratio on this guidepost alone.  Rather, given the UIPA's provision for escalating civil penalties for repeat violations, and other factors, the court concluded that the punitive damages award in that case honored "the Pennsylvania legislature's judgment of appropriate sanctions for [the insurer's] conduct, as evidenced in various provisions of the state's Unfair Insurance Practices Act."  Id.

Here, as in Willow Inn, Defendant's conduct in this case arguably amounts to multiple violations of the state statute.[8] If Defendant did violate the statute, it could have been fined $5,000 for each violation or had its license suspended or revoked. Given these potentially harsh penalties, a significant punitive damages award is

---

[8]  I make no finding that Defendant did or did not violate the UIPA.

justified.  See id.; Hrobuchak, 2004 WL 3333124, at *7.  A $20 million award, however, clearly exceeds the amount necessary to "honor[] the Pennsylvania legislature's judgment of appropriate sanctions for" Defendant's conduct.  Willow Inn, 399 F.3d at 238.  I find that an award in the substantially lower amount of $4.5 million more appropriately addresses this goal.

### 4. Conclusion

In sum, for all of the reasons set forth above, I find that the jury's punitive damage award of $20 million on Plaintiff's bad faith claim is unconstitutionally excessive under the guideposts set forth by the Supreme Court in Gore/State Farm. Accordingly, the punitive damages award is reduced to the amount of $4,500,000, which I find to be the maximum amount the evidence will bear.

## B. FORTUITY

Defendant also requests that I set forth the factual bases for my legal conclusion that Gallatin's loss was fortuitous as to Gallatin.[9]  As Plaintiff points out in its response, Defendant does not offer any authority for the proposition that I have

---

[9]  The Court of Appeals for the Third Circuit has predicted that Pennsylvania would adopt the definition of a fortuitous event found in the Restatement of Contracts (§ 291). Specifically, "[a] fortuitous event . . . is an event which so far as the parties to the contract are aware, is dependent on chance.  It may be beyond the power of any human being to bring the event to pass; it may be within the control of third persons; it may even be a past event, such as the loss of a vessel, provided that the fact is unknown to the parties."  Intermetal Mexicana, S.A. v. Ins. Co. of N. Am., 866 F.2d 71, 77 (3d Cir. 1989).  A fortuitous loss is one that is an "accident," i.e., that was "unplanned and unintentional."  Compagnie des Bauxites de Guinee v. Ins. Co. of N. Am., 724 F.2d 369, 372 (3d Cir. 1983); Peco Energy Co. v. Boden, 64 F.3d 852, 858 (3d Cir. 1995); Peters Twp. Sch. Dist. v. Hartford Accident & Indem. Co., 833 F.2d 32, 37 (3d Cir. 1987) ("The thrust of the definition is that the occurrence be unplanned and unintentional in nature."); see also Koppers Co. v. Aetna Cas. & Sur. Co., 98 F.3d 1440, 1447 (3d Cir. 1996) (framing the question as whether or not the loss was "expected and intended").  The parties agree that whether or not a loss was fortuitous is a question of law for the Court to decide.  See Intermetal Mexicana, 866 F.2d at 74.

16

any obligation to identify the factual findings on which my determination of fortuity rests or that my determination must rest exclusively, or even in part, upon any particular finding by the jury. Pl.'s Br. in Opp. at 13.[10] For purposes of clarity, however, I will grant Defendant's request.

My legal conclusion as to fortuity was based in part on the jury's findings, set forth on the verdict slip, that (1) Defendant did not prove by a preponderance of the evidence that Plaintiff made intentional business decisions in its dealings with Mon View Mining Corporation that resulted in the termination of power to the mine; and (2) Defendant did not prove by a preponderance of the evidence that after Plaintiff became aware that the power to the mine was to be shut off for non-payment of electrical service, Plaintiff made intentional business decisions not to exercise reasonably available contractual or legal rights that, if exercised, would have prevented the claimed loss. See Verdict Slip, questions 4-6. In addition, I found no other credible evidence presented at trial that, even when viewed in the light most favorable to Defendant, would support a conclusion that Plaintiff's loss was non-fortuitous under the above, or any other, theories.

## II. CONCLUSION

For all of the reasons set forth above, Defendant's Pre-Judgment Motion for Review of the Jury's Punitive Damages Award, Including a Due Process Hearing, and Specification of the Jury's Factual Findings on Which the Court's Legal Finding on

---

[10] In a footnote in its Reply Brief, Defendant contends that its request is supported by Federal Rule of Civil Procedure 52(a), which governs findings by the Court. By its terms, however, Rule 52(a) applies only when the jury is not the ultimate fact finder. See Fed. R. Civ. P. 52(a) (the requirements of the rule apply only to "actions tried upon the facts without a jury or with an advisory jury").

Fortuitous Loss Is Based (Docket No. 217) is granted in part and denied in part.

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

GALLATIN FUELS, INC.,                          )
                                               )
                    Plaintiff,                 )
                                               )
   -vs-                                        )
                                                   Civil Action No.  02-2116
                                               )
WESTCHESTER FIRE INSURANCE COMPANY,            )
                                               )
                    Defendant.                 )

AMBROSE, Chief District Judge.

## ORDER OF COURT

AND NOW, this **28ᵗʰ** day of March, 2006, after careful consideration and for the reasons set forth in the accompanying Opinion, it is Ordered that  Defendant's Pre-Judgment Motion for Review of the Jury's Punitive Damages Award, Including a Due Process Hearing, and Specification of the Jury's Factual Findings on Which the Court's Legal Finding on Fortuitous Loss Is Based (Docket No. 217) is GRANTED in part and DENIED in part as follows:

1.  Defendant's Motion for Review of the Jury's Punitive Damages Award is denied to the extent Defendant requests a hearing and/or an opportunity for additional briefing.  Defendant's Motion for Review of the Jury's Punitive Damages Award is granted to the extent Defendant seeks a reduction of the jury's punitive damages award.  For the reasons set forth in the Opinion accompanying this Order, the award of punitive damages in the above-captioned case is hereby reduced to the amount of $4,500,000.

2.   Defendant's request for specification of the jury's factual findings is granted.  My legal conclusion that Plaintiff's loss was fortuitous was based on the jury's factual findings, set forth on the verdict slip, that (1) Defendant did not prove by a preponderance of the evidence that Plaintiff made intentional business decisions in its dealings with Mon View Mining Corporation that resulted in the termination of power to the mine; and (2) Defendant did not prove by a preponderance of the evidence that after Plaintiff became aware that the power to the mine was to be shut off for non-payment of electrical service, Plaintiff made intentional business decisions not to exercise reasonably available contractual or legal rights that, if exercised, would have prevented the claimed loss.  In addition, I found no other credible evidence presented at trial that would support a conclusion that Plaintiff's loss was non-fortuitous under the above, or any other, theories.

BY THE COURT:


/S/   Donetta W. Ambrose

Donetta W. Ambrose,
Chief U. S. District Judge